# EXHIBIT A

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Mark A. Redmond (SBN 161520)<br>656 5th Ave., Suite R San Diego, CA 92101<br><br>TELEPHONE NO.: (619) 225-7655    FAX NO. :<br>EMAIL ADDRESS: mr@markredmondlaw.com<br>ATTORNEY FOR *(Name)*: Plaintiff | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br><br>**04/04/2024**<br>**Clerk of the Court**<br>BY: DAEJA ROGERS<br>Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
Alexander Panelli, individually, and all others similarly situated v. Target Corporation

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $35,000) □ **Limited** (Amount demanded is $35,000 or less) | □ Counter  □ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | **CGC-24-613684**<br>JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- □ Auto (22)
- □ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- □ Asbestos (04)
- □ Product liability (24)
- □ Medical malpractice (45)
- □ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [x] Business tort/unfair business practice (07)
- □ Civil rights (08)
- □ Defamation (13)
- □ Fraud (16)
- □ Intellectual property (19)
- □ Professional negligence (25)
- □ Other non-PI/PD/WD tort (35)

**Employment**
- □ Wrongful termination (36)
- □ Other employment (15)

**Contract**
- □ Breach of contract/warranty (06)
- □ Rule 3.740 collections (09)
- □ Other collections (09)
- □ Insurance coverage (18)
- □ Other contract (37)

**Real Property**
- □ Eminent domain/Inverse condemnation (14)
- □ Wrongful eviction (33)
- □ Other real property (26)

**Unlawful Detainer**
- □ Commercial (31)
- □ Residential (32)
- □ Drugs (38)

**Judicial Review**
- □ Asset forfeiture (05)
- □ Petition re: arbitration award (11)
- □ Writ of mandate (02)
- □ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- □ Antitrust/Trade regulation (03)
- □ Construction defect (10)
- □ Mass tort (40)
- □ Securities litigation (28)
- □ Environmental/Toxic tort (30)
- □ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- □ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- □ RICO (27)
- □ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- □ Partnership and corporate governance (21)
- □ Other petition *(not specified above)* (43)

2. This case □ is  [x] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. □ Large number of separately represented parties
   b. □ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. □ Substantial amount of documentary evidence
   d. □ Large number of witnesses
   e. □ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. □ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary  b. □ nonmonetary; declaratory or injunctive relief  c. □ punitive
4. Number of causes of action *(specify)*: Business tort/ unfair business practice
5. This case [x] is  □ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 04/02/2024
Mark A. Redmond
_____    ▶    *[signature]*
(TYPE OR PRINT NAME)                      (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM010 [Rev. January 1, 2024]
CIVIL CASE COVER SHEET
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-fo·r·service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

LAW OFFICES OF MARK A. REDMOND, PC
Mark A. Redmond (SBN 161520)
656 5ᵗʰ Ave., Suite R
San Diego, California 92101
Telephone: (619) 225-7655
Email: mr@markredmondlaw.com

SALISBURY LEGAL CORP.
Lawrence J. Salisbury (SBN 179748)
656 5ᵗʰ Ave., Suite R
San Diego, California 92101
Telephone: (619) 241-2760
Email: lsalisbury@salisburylegal.com

Attorneys for Plaintiff, individually, and all others similarly situated

ELECTRONICALLY
**F I L E D**
Superior Court of California,
County of San Francisco

**04/04/2024**
**Clerk of the Court**
BY: DAEJA ROGERS
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Alexander Panelli,<br>individually, and all others similarly situated<br><br>    Plaintiffs,<br>v.<br><br>TARGET Corporation, and DOES 1<br>through 100, inclusive<br>    Defendants. | **Case No. CGC-24-613684**<br><br>Case No.<br><br>**CLASS ACTION COMPLAINT** |

COMES NOW, Plaintiff Alexander Panelli, individually and on behalf of himself and all others similarly situated ("Plaintiffs") and brings this action against Defendant TARGET. ("TARGET," or "Defendant") and Does 1 through 100, inclusive, and each of them (collectively, "Defendants"), and alleges on information and belief, except those allegations, which are asserted on personal knowledge, as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to Code of Civil Procedure §410.10 as Defendant is a foreign corporation qualified to do business, and doing business, in California, including San Francisco County, and some of the unlawful conduct alleged herein took place in San Francisco County.

2.     Venue as to each defendant is proper in this judicial district pursuant to Code of Civil Procedure §395.  Defendant is a foreign corporation, headquartered in Minnesota.  Defendants operate and do business within the State of California, including San Francisco County, and each defendant is within the jurisdiction of this Court for service of process purposes.

## PARTIES

3.     Plaintiff is a resident of San Diego, California.

4.     Plaintiff is informed and believes that TARGET is a foreign corporation, headquartered in Minnesota.  It operates and does business throughout the State of California, including San Francisco County.

5.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendants sued herein as Does 1 through 100, inclusive, are currently unknown to Plaintiff, who therefore sues said defendants by such fictitious names under Code of Civil Procedure §474. Plaintiffs are informed and believe, and based thereon allege, that each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of defendants designated hereinafter as DOES when such identities become known.

6.     Plaintiffs are informed and believe, and based thereon allege, that each defendant acted in all respects pertinent to this action as the agent of the other defendant, carried out a joint

scheme, business plan or policy in all respects pertinent hereto, and the acts of each defendant are legally attributable to the other defendants.

7.      Plaintiffs are informed and believe, and based thereon allege, that Defendants are now, and/or at all times mentioned in this Complaint were the agents, servants, franchisers, franchisees, representatives, owners, partners, shareholders, and/or employees of some or all other Defendants, and vice-versa, and in doing the things alleged in this Complaint and that Defendants are now and/or at all times mentioned in this Complaint were acting within the course and scope of that agency, servitude, retention and/or employment.

8.      On information and belief, Defendants are now, and/or at all times mentioned in this Complaint were the affiliates of some or all other Defendants, and vice-versa, and in doing the things alleged in this Complaint, Defendants were directly or indirectly controlling, controlled by or under common control with such other Defendants.

9.      On information and belief, Defendants at all times mentioned in this Complaint approved of, condoned and/or otherwise ratified each and every one of the acts and/or omissions alleged in this Complaint.

## **FACTUAL BACKGROUND**

10.      This is a Class Action, pursuant to Code of Civil Procedure § 382, on behalf of Plaintiff and other similarly situated members of the putative class who have purchased certain sheet sets from TARGET in California.

11.      Plaintiff and others similarly situated were individuals who purchased bedsheets, whether in the form of sheet sheets, individual bedsheets or pillowcases (hereinafter "bedsheet" or "bedsheets") at TARGET locations in California that were advertised by TARGET as having a "thread count" of 600 or more. "Thread count" is not an advertising term or mere puffery but is one of the key elements in the marketing (and ultimately the pricing) of bedsheets. High thread counts have come to mean high quality sheets, whether they be "softer" or "supple" or "durable," or any other host of terms used by marketers like TARGET to suggest that a high thread count bedsheet is desirable and worth the significant extra cost associated with a high thread count. In fact, the price of a given bed set is proportionally tied to the thread count of that given bedsheet.

12.    Thread count is a very specific term used worldwide as it relates to the actual thread count of a particular textile. The globally accepted measurement test for thread count is the test known as the "ASTM D 3775 method for thread count." ASTM, Inc. -- originally known as The American Society for Testing and Materials -- was formed in 1898. The Federal Trade Commission, which is tasked with enforcing textile labeling in the United States (See, for example, The Textile Products Identification Act, 15 U.S.C. § 70, et seq. ("§ 70e. Enforcement (a) Except as otherwise specifically provided herein, this subchapter shall be enforced by the Federal Trade Commission under rules, regulations, and procedure provided for in the Federal Trade Commission Act (15 U.S.C. 41, et seq.))" Although the ASTM has no regulatory authority, as the most widely accepted international body regarding the regulation of textiles in all aspects, the FTC has regularly encouraged the use of ASTM standards for determining whether a particular textile is properly marketed or advertised. Thus, for example, in 2002, the ASTM requested an advisory opinion from the FTC on ASTM's recommended thread count testing method. The FTC was unable to issue an advisory opinion in that context for unrelated reasons but confirmed that any representation regarding "thread count" must have a "reasonable basis" and affirmed that it would give a test like the test recommended by the ASTM "great weight" in determining whether an advertiser has met its "substantiation burden." See Exhibit 1, Letter from FTC to ASTM dated March 18, 2002, at p.2, para. 1.

13.    Several years later, the FTC again opined on the use of ASTM testing standards as regards the proper method of determining thread count. In an August 2, 2005, letter, the FTC responded to an inquiry from the Chairman of the Textile Bedding Committee of the National Textile Association about whether a relatively new industry method of thread counting (which not coincidentally dramatically increased the thread count of a given textile) provided a "reasonable basis" to advertise an increased thread count which resulted from that new counting method. The FTC in essence rejected the newer method of thread counting and endorsed the ASTM D 3775 test: "A representation about thread count, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we consider what experts in the field believe is appropriate, including whether there are relevant

consensus-based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we give such procedures or practices great weight in determining whether the advertiser has met its substantiation burden." See Exhibit 2, Letter from FTC to Mr. E. Linwood Wright, Ill, Chairman, Textile Bedding Committee, National Textile Association, p. 2, para. 2.

14.    In fact, the FTC went further, and determined that the new testing method at issue in that letter could deceive or mislead consumers "by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: '300 thread count, 2 ply yarn.' A representation of '600 thread count' for this same product would likely mislead consumers about the quality of the product being purchased." Exhibit 2 at p. 2, para. 3.

15.    Thus, use of the FTC endorsed ASTM D 3775 thread count testing method is the industry standard and one of the primary bases upon which the FTC would determine whether or not a "reasonable basis" exists for an advertisers' thread count representations. The specifics of the ASTM D 3775 test method is beyond the scope of this complaint, but is attached hereto as Exhibit 3 in its entirety. While the ASTM D 3775 test does not specify the exact physical method of counting individual threads, there are several methods of doing so, all of which yield equivalent results.

16.    A textile thread count can be assessed by measuring one inch on both the warp and weft sides and then counting all of the yarns within that square inch. Warp is the long yarn that runs vertically up and down the roll of fabric, this governs the vertical pattern repeat. Weft is the yarn that passes horizontally across the fabric roll, generally is shorter, and governs the horizontal pattern repeat. In other words, adding the number of threads in both the warp and weft of one square inch of fabric yields the most accurate thread count of bedsheets.

17.    Another process is to cut out a one square inch of fabric and then counting all the yarns (both the warp and the weft) within the square inch.

18.    By whatever method, a proper thread count is important information for a potential consumer for many reasons, but primary among them is the perceived value inherent in considering

whether to buy a higher thread count bedsheet. Thread count is a primary driver of the pricing of bedsheets. Plaintiff intends to provide expert testimony demonstrating on an industry basis that the pricing trend of bedsheets rise in direct proportion to thread count and its perceived superior quality. But that issue has already been addressed by previous courts considering the issue. *Hawes v. Macy's Stores W., Inc.*, No. 1:17-CV-754, 2022 WL 194407, at *16 (S.D. Ohio Jan. 22, 2022) (The record reflects "more than enough" evidence demonstrating thread count as a significant factor in 'consumers' choice of bedsheets.").

19.    In the case of the Plaintiff in this case, he was in particular interested in a higher thread count in shopping for replacement sheets. He researched both brick-and-mortar stores and on-line retailers. After extensive research, he determined that pricing as it related to thread count were material factors in his choice, and he eventually purchased bedsheets from TARGET that he understood were higher priced than other TARGET bedsheet options, but that he believed were priced for their higher thread count. In particular, he purchased a "100% cotton" queen sheet set of "Threshold Signature" sheets with a thread count of 800, which were distributed by TARGET Corporation. Pictures of the actual packaging are below, as well as the current representation on the Target website.



Class Action Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15      20.      That sheet set is still available at TARGET is advertised as an "800 Thread Count,"

16  100% cotton sheet set, as it is on the packaging of Plaintiff's purchase.

17      21.      Based on the representations on the bedsheet packaging and labeling regarding the

18  800 Thread Count, 100% cotton sheets, Plaintiff opted to purchase them for a higher price than

19  other bedsheets without the same purported qualities that were also for sale at TARGET. But for the

20  800 Thread Count, 100% cotton representation, Plaintiff would not have purchased the bedsheets.

21      22.      Independent testing of the bedsheets purchased by Plaintiff, using the guidelines

22  recommended by the FTC under the ASTM D 3775 guidelines, confirmed that the bedsheet set

23  purchased by Plaintiff did not have an 800 thread count but instead had a thread count of 168 x 120,

24  or a total thread count of 288, which is 64% lower than the advertised thread count of 800.

25      23.      Plaintiff's bedsheet purchase is typical of high thread count sheets sold by TARGET.

26  There are many other bedsheets sold by TARGET which advertise similar misleading thread

27  counts. For example, TARGET markets with deceptive thread counts, including offers for sale a 5-

28

Star Luxury Sheet Set 600 Count 100% Cotton Sateen, under the brand name California Design Den, also distributed by the TARGET Corporation.



https://www.target.com/p/5-star-luxury-sheet-set-600-thread-count-100-cotton-sateen-soft-crisp-bed-sheets-with-deep-pockets-by-california-design-den/-/A-79313593?preselect=79313619#lnk=sametab

24.    As a further example, TARGET currently markets and sells a "Premium Cotton 1000 Thread Count" sheet set composed of 100% cotton, pictured below:



https://www.target.com/p/premium-cotton-1000-thread-count-solid-deep-pocket-4-piece-bed-sheet-set-by-blue-nile-mills/-/A-83436779?preselect=83436796#lnk=sametab

///

///

///

///

///

///

///

///

///

1    25.    As another example, TARGET currently markets and sells a 1200 thread count

2  100% cotton sheet set, pictured below:

Shop all Blue Nile Mills

**1200-Thread Count Cotton Deep
Pocket Sheet Set - Blue Nile Mills**

★★★★☆ 36 ∨    11 Questions

● In stock · Online only

 

● ○

**$176.80** reg $208.00

**Sale** save $31.20 (15% off)

When purchased online ⓘ

size  **queen**  Size chart

king    **queen**    california king    full

color  **sage**

https://www.target.com/p/1200-thread-count-cotton-deep-pocket-sheet-set-blue-nile-mills/-/A-81523593?preselect=81523610#lnk=sametab

26.    On information and belief, any marketing or advertising of 100% cotton bedsheets

consisting of a thread count of 600 or higher is false and misleading. This is so because it is

physically impossible for cotton threads to be fine enough to allow for 600 or more threads in a single square inch of 100% cotton fabric. Thus, all of the 100% cotton sheet sets advertised or otherwise marketed by TARGET that claim a thread count of 600 or higher are falsely advertised, including but not limited to the bedsheets purchased by Plaintiff here.

27.    Moreover, the false thread count issue is not new to TARGET, which was well aware of the simple fact that only a certain number of threads could physically fit into one square inch of fabric. As part of its "Product Safety & Quality Assurance" program, TARGET claims that: "Product and food safety is a top priority, and we make sure our products and how they are produced meet or exceed mandatory safety standards. Frequently, we require Target-brand vendors to test beyond regulatory requirements and take special care with children's products and toys. We expect our vendors to comply with good manufacturing practices or documented manufacturing and quality processes. We also require Target-brand products be tested at third-party testing labs."
Product Safety and Quality Assurance | Target Corporation

28.    TARGET further claims that it has "tools and processes in place to address product safety and assure quality at every stage of production. Before production starts, we audit the factory and meet with the vendor and manufacturer. We require vendors to test Target-brand products at third-party laboratories throughout production. A Target-brand product must pass all testing before it's approved for shipment."

29.    Assuming TARGET actually complies with its own publicly stated policies, TARGET was likely well aware of the incorrect thread count in all of its bedsheets with a thread count of 600 or higher.

30.    Moreover, other independent sources, and even TARGET competitors, recognized the thread count issue and advertise their products honestly, and without deceptively high false thread counts.

31.    "Thread count is the number of vertical and horizontal threads per square inch. Not long ago, sheets typically had thread counts of 120 with 60 horizontal and 60 vertical threads. In the 1960's, a sheet with a 180-thread count was considered a luxury.  "Now you see 1,000 thread count sheets, but you just can't get that many threads on a loom," says Pat Slaven, a textile expert at

Consumer Reports. To get that higher number, manufacturers use thinner strands of fabric twisted together as if they were one. Then they double, triple or even quadruple the thread count to make the number more attractive to the consumer. "It ups the count but doesn't give you a better sheet," says Slaven. "The sweet spot is 400." https://www.consumerreports.org/cro/news/2013/09/higher-thread-count-doesn-t-guarantee-better-sheets/index.htm

32.    "There's a maximum number of threads that can fit into a square inch of fabric," explained Scott Tannen, CEO of Boll & Branch, a luxury linen provider. Depending on the type of cotton used, that number is generally not more than 400. So, there is an awful lot of interesting math involved in the sheets you see in a department store that can be up to a 1,200-thread count. https://www.businessinsider.com/guides/home/best-thread-count-for-sheets#:~:text=A%20regular%20ply%20300%20thread,the%20package%2C%22%20Tannen%20said.

33.    In a previous study, seven out of eight sheets tested by the Good Housekeeping Institute flunked thread count tests. "There are telltale ways to spot an exaggerated count.,,,When Good Housekeeping analyzed sample sheets, it found manufacturers exaggerating their thread count by three to five times. They found one sheet that was labeled as having a 1,500-thread count, but it actually only had 300 threads per square inch." https://abcnews.go.com/GMA/Moms/story?id=1751253&page=1

34.    "You may see sheets with thread counts well over 1,000 on store shelves, but this is likely due to manipulative marketing. Keep in mind that there are only so many threads that can physically fit into a square inch of fabric." https://www.pimacott.com/blog/thread-count-faq-myths-facts

35.    "Thread Count refers to the number of threads woven into one square inch of fabric. But in reality, there is more to the story than tallying the warp and welt and deeming a fabric as "luxury". Only so many threads can fit into a one square inch. When it comes to bed linen, 400 threads per square inch, is about all that will fit into that space. Unfortunately, some mills engage in some creative counting to achieve 1,000-plus thread count numbers." https://www.loomlux.com/our-fabrics

36.    Plaintiff brings this action for violation of Bus. & Prof. Code §§ 17200 and 17500, for unjust enrichment and for fraudulent misrepresentation seeking general damages, special damages, and punitive damages. Concurrent with the service of this complaint, Plaintiff will serve a Notice of Violation of the California Consumers Legal Remedies Act And 30-Day Right to Cure, under Civil Code §1782. Plaintiff will amend his complaint after the expiration of the 30-day notice period if TARGET does not cure and assert claims for violation of the California Consumer Legal Remedies Act, Civil Code §1750, et seq., and seek all available remedies thereunder, including attorney fees, pursuant to Civil Code § 1780.

## CLASS ACTION ALLEGATIONS

37.    Plaintiff brings this action on behalf of himself, and all others similarly situated, as a class action pursuant to Code of Civil Procedure §382.  Plaintiffs seek to represent a class composed of and defined as follows:  All individuals in California who purchased bed sheet sets, or individual sheets or pillowcases, that were advertised and marketed as being comprised of 100% cotton with a thread count of 600 or higher, four years prior to the filing of the complaint. (collectively referred to as the "Class").

38.    Excluded from the Class are the officers, directors, and employees of TARGET and the legal representatives, heirs, successors and assigns of any excluded person.

39.    Plaintiffs reserve the right under Rules of Court, Rule 3.765(b), to amend or modify the class description with greater specificity or further division into subclasses or limitation to particular issues.

40.    This action has been brought and may properly be maintained as a class action under the provisions of Code of Civil Procedure §382 because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable:

a.    Numerosity:  The potential members of the Class as defined are so numerous that joinder of all members of the Class is impracticable.  While the precise number of members of the Class has not been determined at this time, Plaintiff is informed and believes that TARGET has sold thousands of sheets sets in the last four years in

California that were marketed as containing 100% cotton with a thread count of 600 or higher.

    b.    Commonality:  There are questions of law and fact common to all members of the Class.  These common questions include, but are not limited to:

i.    Whether TARGET makes misrepresentations and/or omissions of material fact regarding the thread count of its 100% cotton sheets with thread counts of 600 or higher?

ii.    Whether statements made by TARGET in its advertising, marketing, packaging or labeling were false and misleading;

iii.    Whether TARGET engaged in unfair, fraudulent, or unlawful business practices regarding its marketing of 100% cotton sheets containing thread counts of 600 or higher;

iv.    Whether TARGET's misrepresentations as to 100% cotton sheets containing thread counts of 600 or higher constitute breaches of express and/or implied warranties; concerning the Products at issue;

v.    Whether TARGET's conduct injured Plaintiff and class members; and

vi.    Whether Plaintiffs and class members are entitled to damages or other relief.

    c.    Typicality:  The claims of Plaintiffs herein alleged are typical of those claims which could be alleged by any member of the Class and the relief sought is typical of the relief which would be sought by members of the Class in separate actions.  Plaintiff and all members of the Class sustained injuries and damages arising out of and caused by TARGET's common course of conduct, in violation of laws and regulations that have the force and effect of law as alleged herein.

    d.    Adequacy of Representation:  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Counsel who represent Plaintiffs are competent and experienced in litigating class actions.

    e.    Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all members of the Class is not practicable, and questions of law and fact common to the

Class predominate over any questions affecting only individual members of the Class. Each member of the Class has been damaged and is entitled to recovery by reason of TARGET's unlawful conduct.

f.    Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FIRST CAUSE OF ACTION

**(Violation of California's Unfair Competition Law ("UCL"),
California Business and Professions Code § 17200, et seq.)**

41.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

42.    Under the UCL "unfair business competition" include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code § 17200. The application of the UCL is a strict liability standard. Whether or not TARGET intentionally or negligently engaged in any unlawful, unfair or fraudulent business practices, they are liable if those practices occurred.

43.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

44.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

45.    A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

46.    As alleged above, TARGET advertising, marketing and sales of 100% cotton sheet sets, sheets or pillowcases with a thread count of 600 or higher violates all three prongs of the UCL.

47. It is unfair in that it is substantially injurious to consumers, and the harm to Plaintiff and Class members outweighs any utility of TARGET's practices.

48. It is fraudulent because it is likely to deceive members of the public, including the Class.

49. It is unlawful because it violates several other laws or regulations, including, but not limited to:

    a. TARGET advertising, marketing and sales of 100% cotton sheet sets, sheets or pillowcases with a thread count of 600 or greater violates Cal. Bus. & Prof. Code § 17500's prohibition against false advertising.

    b. It violates The Federal Trade Commission's Act ("FTCA") prohibition against "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and the dissemination of any false advertisements. 15 U.S.C. § 52(a).

    c. It also violates the Consumers Legal Remedies Act, Civil Code § 1750, et seq., in multiple ways, and at least as follows: violation of Section 1770(a)(5) which prohibits "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have. Violation of Section (a)(7) which prohibits "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." And violation of Section (a)(9) which prohibits "[a]dvertising goods or services with intent not to sell them as advertised."

50. Plaintiff relied on TARGET's fraudulent and deceptive representations and these misrepresentations played a substantial role in Plaintiff's decision to purchase the products, and Plaintiff would not have purchased those products without Barneys' misrepresentations.

51. TARGET's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Class members and

1    the public will be deceived into purchasing products based on false thread count representations,

2    These false representations led to financial damage for consumers like Plaintiff and the Class.

3        52.    Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive

4    relief and order TARGET to cease this unfair competition, as well as disgorgement and restitution

5    to Plaintiff and the Class of all TARGET's revenues associated with its unfair competition, or such

6    portion of those revenues as the Court may find equitable.

7                          **SECOND CAUSE OF ACTION**

8                  **(Violation of California's False Advertising Law ("FAL")**
                   **California Business & Professions Code § 17500, et seq.)**
9

10       53.    Plaintiff repeats and re-alleges the allegations contained in every preceding

11   paragraph as if fully set forth herein.

12       54.    Cal. Bus. & Prof. Code § 17500 provides:

13        It is unlawful for any…corporation…with intent…to dispose of…personal
          property…to induce the public to enter into any obligation relating thereto, to
14        make or disseminate or cause to be made or disseminated…from this state
          before the public in any state, in any newspaper or other publication, or any
15        advertising device, or by public outcry or proclamation, or in any other manner
          or means whatever, including over the Internet, any statement…which is
16        untrue or misleading, and which is known, or which by the exercise of
          reasonable care should be known, to be untrue or misleading…"
17        (Emphasis added).

18       55.    The "intent" required by Section 17500 is the intent to dispose of property, and not

19   the intent to mislead the public in the disposition of such property.

20       56.    TARGET misled consumers by making untrue and misleading statements as detailed

21   above.

22       57.    As a direct and proximate result of TARGET's misleading and false advertisements,

23   Plaintiff and Class members have suffered injury in fact and have lost money. As such, Plaintiff

24   requests that this Court order TARGET to restore this money to Plaintiff and all Class members,

25   and to enjoin TARGET from continuing these unfair practices in violation of the UCL in the future.

26   Otherwise, Plaintiff, Class members, and the broader general public, will be irreparably harmed

27   and/or denied an effective and complete remedy.

28

**THIRD CAUSE OF ACTION**

**(Unjust Enrichment)**

58.     Plaintiff incorporates by reference the allegations contained in all proceeding paragraphs of this complaint.

59.     Plaintiff and the Class conferred benefits on TARGET by purchasing the misrepresented sheet sets, individual sheets or pillowcases.

60.     TARGET knew of those benefits.

61.     TARGET has been unjustly enriched in retaining the revenues derived from those purchases and should not be allowed to retain their unjust and inequitable revenues because TARGET misrepresented their products.

62.     Plaintiff and the Class have suffered an injury in fact and have lost money as a result of Defendant's unjust conduct. Plaintiff and the Class lack an adequate remedy at law and are entitled to non-restitutionary disgorgement of the profits that Defendant obtained as a result of its unjust conduct.

**FOURTH CAUSE OF ACTION**

**(Fraud)**

63.     Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

64.     As set forth above, TARGET, by and through its authorized representatives, made misrepresentations and omissions to the Class that, at the time, TARGET knew to be false, or made them recklessly without regard for the truth. In addition, TARGET intentionally concealed material information and/or made those representations and omissions with the intention and purpose of deceiving the Class.

65.     The Plaintiff, and by inference the Class, reasonably relied on those misrepresentations and omissions to its detriment. The Plaintiff would not have purchased the TARGET sheet set if he had known the truth, and it is reasonable to infer that the Class would not have either.

66.    The Class sustained losses as a direct and proximate result of TARGET's misrepresentations and omissions, including but not limited to the cost of the sheet sets that were marketed and sold as containing thread counts that were inaccurate and misleading.

67.    As a direct and legal cause of TARGET's misrepresentations as herein alleged, the Class seeks general damages in an amount to be shown at trial.

68.    TARGET's conduct constitutes oppression, fraud and malice and the Class is entitled to recover damages for the sake of example and by way of punishing Defendants pursuant to Civil Code § 3294.

WHEREFORE, Plaintiff prays for judgment against the Defendant as hereinafter set forth.

## **PRAYER**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment against TARGET as follows:

1.    For an order certifying the Class under Code of Civil Procedure § 382, naming Plaintiff as the representative of the Class, and Plaintiff's attorneys as Class Counsel to represent the Class;

2.    For an order finding that TARGET actions as alleged above violate the referenced statutes and therefore Plaintiffs are entitled to prevail on all causes of action;

3.    For compensatory, statutory and punitive damages, according to proof;

4.    For an order of restitution and equitable monetary relief, including non-restitutionary disgorgement;

5.    Pre-judgment interest;

6.    Costs;

5.    Reasonable attorneys' fees; and

6.    Such other and further relief as the Court deems just and proper.

LAW OFFICES OF MARK A. REDMOND

Dated:  March 29, 2024          By: _____
                                       Mark A. Redmond, Esq.
                                       Attorney for Plaintiffs

# EXHIBIT 1



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20580

Division of Enforcement
Bureau of Consumer Protection

March 18, 2002

Mr. Carlos Moore
Executive Vice President
American Textile Manufacturers Institute
1130 Connecticut Ave., NW, Suite 1200
Washington, DC 20036-3954

Re:  Request for FTC Staff Opinion concerning Thread Count

Dear Mr. Moore:

This is in reply to your letter requesting a Commission staff opinion regarding the appropriate method for determining fabric "thread count," or yarns per square inch, in textile products such as bed sheets and pillow cases. You state that some companies are marketing bedding products with extremely high yarn or thread counts, achieved by counting yarns within a ply as individual yarns, thus dramatically and deceptively increasing the number of yarns in a square inch of fabric. You make specific reference to the American Society for Testing and Materials (ASTM) test method D 3775, titled "Standard Test Method for Fabric Count of Woven Fabric," and you express the view that this method is the long-accepted industry standard for determining thread count.

Under the Commission's Rules of Practice, 16 C.F.R. § 1.1(a), the Commission (and, under delegated authority, its staff) may render an advisory opinion with respect to a prospective course of conduct proposed by the requesting party:

> § 1.1  Policy.
>
> (a) Any person, partnership, or corporation may request advice from the Commission with respect to a course of action which the requesting party proposes to pursue.

In this instance, ATMI is not seeking advice with respect to a course of conduct it proposes to pursue. Rather, ATMI is seeking an opinion as to whether certain representations made by some industry members with regard to thread count might be considered deceptive under the FTC Act. As such, the question is not appropriate for issuance of a staff advisory opinion.

Mr. Carlos Moore
page 2

Although we are unable to provide you with a staff advisory opinion about whether counting yarns within a ply as individual yarns would be deceptive, we can advise you as to how the Commission staff generally would analyze such claims. A thread count claim, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we would consider what experts in the field believe is appropriate, including whether there are relevant consensus based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we would give such procedures or practices great weight in determining whether the advertiser has met its substantiation burden. In other related contexts, the Commission has encouraged the use of ASTM tests. *See* Press Release, FTC Announces Actions on Wool Labeling Rules, dated March 8, 1994 (copy attached) ("In its clarification of the procedure used for testing the fiber content of wool products, the FTC said the industry members should, where possible, use procedures established by the American Society for Testing and Materials (ASTM).")

I also wish to bring to your attention a closing letter that is on the public record concerning an investigation of possibly deceptive practices in connection with the packaging of down comforters. In that instance, the staff determined that no further Commission action was warranted when the company notified the staff that it was changing its package product description from "760 White Goose Down" to "finely woven 380 2-ply fabric." (copy attached).

Pursuant to Section 1.4 of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 1.4, your letter, together with this response, will be placed on the public record.

I hope you will find the above information helpful.

Sincerely yours,

Elaine D. Kolish
Associate Director for Enforcement

Enclosures



# FTC news

**Federal Trade Commission** *Washington, D.C. 20580*

**FOR IMMEDIATE RELEASE:** **March 8, 1984**

### FTC ANNOUNCES ACTIONS
### ON WOOL LABELING RULES

The Federal Trade Commission has decided, after reviewing public comments, not to change its rule requiring a label stating the minimum wool content on wool products. The Commission also issued a clarification of the procedures it uses for testing wool products to determine their fiber content. The FTC enforces wool-labeling rules under the Wool Products Labeling Act.

In April 1983, the FTC sought comments on whether it should amend its rules to allow labels to disclose the average amount, rather than the minimum amount, of wool in fabrics that contain recycled wool or wool blend products. Using the average amount might provide consumers more accurate information, the FTC said, but using the minimum assures that consumers will receive at least the amount of wool on the label.

However, after reviewing the comments, the Commission decided not to amend the rule, because there was no evidence on the record to support the change.

In its clarification of the procedure used for testing the fiber content of wool products, the FTC said the industry members should, where possible, use procedures established by the American Society for Testing and Materials (ASTM).

The test should be made on an "oven-dry basis," with "commercial moisture regain" added to determine the quantitive fiber content of a wool product.

The ASTM defines oven-dry basis as "the condition of a material that has been heated under prescribed conditions of temperature and humidity until there is no further significant change in its mass." Commercial moisture regain is "an arbitrary value to be used with the oven-dry weight" when calculating "the weight of a specific component in the analysis of fiber blends."

Copies of the Federal Register notice on the minimum wool content rulemaking decision are available from the FTC's Public Reference Branch, Room 130, 6th St. and Pennsylvania Ave. N.W., Washington, D.C. 20580; 202-523-3598; TTY 202-523-3638. News media copies are available from the Office of Public Affairs, Room 496, same address; 202-523-1892.

# # #

MEDIA CONTACT:     Susan Ticknor, Office of Public Affairs, 202-523-1892

STAFF· CONTACT:     Jerry McDonald, Bureau of Consumer Protection, 202-376-2800 (labels)
Earl Johnson, Bureau of Consumer Protection, 202-376-2891 (test methods)



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

**Division of Enforcement**
**Bureau of Consumer Protection**

April 8, 1996

Jeffrey Goldman, President
California Feather & Down Corporation
11842 S. Alameda St.
Lynwood, CA 90262

   Re:  California Feather & Down Corporation, 9523373

Dear Mr. Goldman:

     The Commission has conducted an investigation involving your
company's possible violation of the Federal Trade Commission Act
through the use of unfair acts or deceptive acts or practices in
connection with the packaging of down comforters.

     By letter dated March 12, 1996, Mr. N. Frank Wiggins stated
that your company is removing the reference to "760" from the
packaging and labeling of your "White Knights 760 White Goose
Down Comforter." Further, Mr. Wiggins' August 12, 1995, letter
stated that the company had revised the text of the packaging for
this product to say that the White Knights 760 White Goose Down
Comforter contains "finely woven 380 2-ply fabric. . . ." The
former packaging had stated "finely woven 760 threads per sq.
inch. . . ."

     Upon further review of this matter, it now appears that no
further action is warranted by the Commission at this time.
Accordingly, the investigation has been closed. This action is
not to be construed as a determination that a violation has not
occurred, just as the pendency of an investigation should not be
construed as a determination that a violation has occurred. The
Commission reserves the right to take such further action as the
public interest may require.

                   Sincerely,

                   Elaine D. Kolish
                   Associate Director

cc:  N. Frank Wiggins, Esq.
     Venable, Baetjer, Howard & Civiletti, LLP
     1201 New York Avenue, NW, Suite 1000
     Washington, DC  20005-3917





FEDERAL TRADE COMMISSION

JAN 3 1 2002

DIVISION ENFORCEMENT

## AMERICAN TEXTILE
## MANUFACTURERS INSTITUTE

January 31, 2002

Mr. Steve Ecklund
Federal Trade Commission
Division of Enforcement
Washington, DC  20580

Re:    Request for FTC Staff
       Opinion on Yarn Count

Dear Mr. Ecklund:

It has come to our attention again that some companies are marketing bed sheets and pillowcases to U.S. consumers where extremely high yarn or thread counts are claimed – some as high as 1000 count.  We believe these products are mislabeled, creating deceptive information for the consumer.

Labeling these products based on a count that includes each ply in plied yarns deceives the customer into believing that bedding products with higher counts are better when, in fact, they might be inferior because of the method used to determine the count.  We wrote to the Commission regarding this same issue on February 24, 1997 (copy enclosed) and provided a fabric sample and independent lab report verifying our position.

In many cases, these extremely high counts are achieved by counting yarns within a ply as individual yarns, thus dramatically increasing the number of yarns in a square inch of fabric.  A plied yarn is one in which two or more yarns are twisted together to form a single strand.

ATMI believes this method of labeling products based on counting each individual yarn in plies to be a deceptive practice, which misleads the American





1130 Connecticut Ave., NW • Suite 1200 • Washington, DC  20036-3954
202-862-0500 • fax:  202-862-0570 • http://www.atmi.org
fax on demand:  202-862-0572

public into making decisions to purchase items, based on false and misleading information.

ASTM method D 3775-96 (Standard Test Method for Fabric Count of Woven Fabric) is the long-accepted industry standard for determining count. This method has been in use in this country for many years and serves as the industry's standard way to report the count of many woven textile fabrics, including sheeting. It is based on the number of yarns in the warp direction and filling direction, regardless of ply, and has become an important parameter used by consumers to judge the quality of sheeting products, since the higher the count, the more luxurious the product.

ATMI believes that any information provided to the consumer should be true and correct so as not to be deceptive or mis-leading. We believe that plied yarns are properly counted as only one yarn. For example, a fabric containing 250 individual four ply yarns in a square inch would be described as a "250 thread count fabric, even though each thread or yarn contained four plies twisted together." It would be false and mis-leading to describe this as a 1000 thread count product.

ATMI requests a staff opinion from the Federal Trade Commission on this issue. We believe that manufacturers, importers and retailers of bed sheets should rely on the ASTM D3775-96 standard test method to determine count.

Sincerely,

Carlos Moore

Carlos Moore
Executive Vice President

Enclosure

EXHIBIT 2



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Enforcement
Bureau of Consumer Protection

August 2, 2005

Mr. E. Linwood Wright, III
Chairman
Textile Bedding Committee
National Textile Association
6 Beacon Street, Suite 1125
Boston, MA 02108

Dear Mr. Wright:

Thank you for your letter requesting a Commission staff opinion regarding the appropriate way to disclose fabric "thread count" (yarns per square inch) on labels or in advertising for household textile products, such as bed sheets. Please note that this information is not required pursuant to the Textile Fiber Products Identification Act, 15 U.S.C. § 70 *et seq.*, and Commission rules and regulations under the Act, 16 C.F.R. Part 303. It is, however, governed by Section 5 of the FTC Act, which prohibits deceptive acts or practices. 15 U.S.C. § 45.

You state that the thread count is an important indicator of fabric quality for consumers who purchase textile bedding products, and that thread count has evolved over time as a key indicator used by consumers to make purchasing decisions. In addition, you state that it is generally understood that a higher thread count indicates a better product. Your letter describes the specific issue with regard to description of thread count as follows:

> The common practice in the U.S. textile bedding industry for decades has been to count the number of threads in both the warp and filling directions. Yarns were counted as one yarn, regardless of whether the yarn was a single ply or multi-ply yarn. (A multi-ply yarn is one yarn that has been created by twisting two or more yarns together.) In recent years, however, some textile bedding suppliers have changed the way they have determined thread count by counting plied yarns individually. This practice inflates the thread count numbers to levels which double or triple (or more) the thread count as determined by the long standing, traditional way. This practice has also created confusion in the marketplace and has caused consumers to compare thread counts that may have been calculated in two dramatically different ways.

Finally, you state that some of your member companies have experienced competitive disadvantage by using the traditional method of counting threads and are considering switching to the method of multiplying by the number of plies within a yarn, thus achieving a higher thread count. You ask for the staff's opinion as to whether the new method could violate Section 5 of the FTC Act.

Mr. E. Linwood Wright, III, page 2

You further note that ASTM, an international standards organization, has addressed this issue in its Standard Test Method for Warp End Count and Filling Pick Count of Woven Fabric, Designation: D3775-03a. Section 9.1.4 instructs: "Count individual warp yarns (ends) and filling yarns (picks) as single units regardless of whether they are comprised of single or plied components."

A representation about thread count, like other objective, material claims about a product, must be supported by a "reasonable basis." In determining what constitutes a reasonable basis for claims, we consider what experts in the field believe is appropriate, including whether there are relevant consensus based test procedures, such as an ASTM test procedure, or other widely accepted industry practices that apply to the matter. If so, we give such procedures or practices great weight in determining whether the advertiser has met its substantiation burden.

Based upon the ASTM standard, as well as the information you have provided about standard industry practices with regard to disclosing thread count, we believe that consumers could be deceived or misled by the practice of stating an inflated thread count, achieved by multiplying the actual count by the number of plies within the yarn. A possible non-deceptive way to disclose both the thread count and the yarn ply would be to state, for example: "300 thread count, 2 ply yarn." A representation of "600 thread count" for this same product would likely mislead consumers about the quality of the product being purchased.

I also wish to bring to your attention a 1996 closing letter, placed on the FTC public record, terminating an investigation of possibly deceptive practices in connection with the packaging of down comforters. In that instance, the staff determined that no further Commission action was warranted when the company notified the staff that it was changing its package product description from "finely woven 760 threads per sq. inch" to "finely woven 380 2-ply fabric." A copy of this closing letter is attached.

In accordance with Section 1.3(c) of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 1.3(c), this is a staff opinion only and has not been reviewed or approved by the Commission or by any individual Commissioner, and is given without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement action. In accordance with Section 1.4 of the Commission's Rules of Practice and Procedure, 16 C.F.R. § 1.4, your request for advice, along with this response, will be placed on the public record.

We appreciate your taking the time to write to us. Please feel free to call Steve Ecklund at 202-326-2841 if you have any further questions.

Sincerely yours,

James Kohm
Associate Director for Enforcement

Enclosure



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Enforcement
Bureau of Consumer Protection

April 8, 1996

Jeffrey Goldman, President
California Feather & Down Corporation
11842 S. Alameda St.
Lynwood, CA 90262

    Re:  California Feather & Down Corporation, 9523373

Dear Mr. Goldman:

    The Commission has conducted an investigation involving your
company's possible violation of the Federal Trade Commission Act
through the use of unfair acts or deceptive acts or practices in
connection with the packaging of down comforters.

    By letter dated March 12, 1996, Mr. N. Frank Wiggins stated
that your company is removing the reference to "760" from the
packaging and labeling of your "White Knights 760 White Goose
Down Comforter."  Further, Mr. Wiggins' August 12, 1995, letter
stated that the company had revised the text of the packaging for
this product to say that the White Knights 760 White Goose Down
Comforter contains "finely woven 380 2-ply fabric. . . ."  The
former packaging had stated "finely woven 760 threads per sq.
inch. . . ."

    Upon further review of this matter, it now appears that no
further action is warranted by the Commission at this time.
Accordingly, the investigation has been closed.  This action is
not to be construed as a determination that a violation has not
occurred, just as the pendency of an investigation should not be
construed as a determination that a violation has occurred.  The
Commission reserves the right to take such further action as the
public interest may require.

                        Sincerely,

                        Elaine D. Kolish

                        Elaine D. Kolish
                        Associate Director


cc:  N. Frank Wiggins, Esq.
     Venable, Baetjer, Howard & Civiletti, LLP
     1201 New York Avenue, NW, Suite 1000
     Washington, DC  20005-3917

Case 3:24-cv-02748-SK   Document 1-1   Filed 05/08/24   Page 34 of 46

# National Textile Association

6 Beacon Street • Suite 1125 • Boston, Massachusetts 02108
617 542-8220 • info@nationaltextile.org • www.nationaltextile.org • 617 542-2199 fax

**ORIGINAL**

May 23, 2005
By FAX 202-326-2496

FEDERAL TRADE COMMISSION
RECEIVED DOCUMENTS
218296
JUN 1 5 2005
517516
SECRETARY

Mr. Donald S. Clark, Secretary
U.S. Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580

Re:   Request for Staff Opinion

Dear Mr. Secretary:

Pursuant to 16. C.F.R. Section 1, the National Textile Association ("NTA")
requests a staff opinion from the Federal Trade Commission (the "Commission")
regarding the method for determining thread count in textile bedding products.
The NTA is the largest trade association representing the U.S. Textile Industry and its
suppliers, and consists of about 125 companies that spin yarns; manufacture fabrics;
dye, finish and print fabrics; and cut and sew top-of-the-bed textile products.

The thread count (number of threads per square inch of fabric) is an important indicator
of fabric quality for consumers who purchase textile bedding products such as bed
sheets. Thread count has evolved over time as a key indicator used by consumers to
make purchasing decisions. Generally, it is perceived that the higher the thread count,
the better the end product.

The common practice in the U.S. textile bedding industry for decades has been to count
the number of threads in both the warp and filling directions. Yarns were counted as one
yarn, regardless of whether the yarn was a single ply or multi-ply yarn. (A multi-ply yarn
is one yarn that has been created by twisting two or more yarns together.) In recent
years, however, some textile bedding suppliers have changed the way they have
determined thread count by counting plied yarns individually. This practice inflates the
thread count numbers to levels which double or triple (or more) the thread count as
determined by the long standing, traditional way. This practice has also created
confusion in the marketplace and has caused consumers to compare thread counts that
may have been calculated in two dramatically different ways.

NON-PUBLIC

Mr. Donald S. Clark, Secretary
U.S. Federal Trade Commission
May 23, 2005
Page 2

The ASTM, an international standards writing organization, addressed the thread count issue in standard D3775-03a (see Section 9.1.4) which states that ends and picks are counted as single units regardless of whether they are comprised of singles or plied yarns. ASTM committee D13.63 on home furnishings is working on a specific definition of thread count for sheets and similar bedding products that would also treat multi-ply yarns as one yarn, though that process is still in the preliminary stage.

Because of the competitive disadvantage imposed on companies that use the traditional way of not considering yarn plies in the final count, some of our members are contemplating changing over to calculating thread count where each ply within a yarn is counted. We ask the Commission's staff for its opinion on whether such a change would be in violation of 15 U.S.C. Section 45(a)(1) of the Federal Trade Commission Act.

We will be pleased to provide any additional information to the Commission staff as it addresses this issue which affects the many consumers who use thread count information to make purchase decision for textile bedding products.

                                        Sincerely,

                                        E. Linwood Wright

                                        E. Linwood Wright, III
                                        Chairman,
                                        Textile Bedding Committee

EXHIBIT 3

**ASTM INTERNATIONAL**

Designation: D3775 – 03a

# Standard Test Method for
# Warp End Count and Filling Pick Count of Woven Fabric[1]

This standard is issued under the fixed designation D3775; the number immediately following the designation indicates the year of original adoption or, in the case of revision, the year of last revision. A number in parentheses indicates the year of last reapproval. A superscript epsilon (ε) indicates an editorial change since the last revision or reapproval.

## 1. Scope

1.1 This test method covers the measurement of warp end count and filling pick count and is applicable to all types of woven fabrics.

NOTE 1—Historically the term fabric count has been used to describe the warp end count and the filling pick count in woven fabrics. The terms warp end count and filling pick count are replacing the term fabric count to provide clarity and agreement with the text and the intent of Test Method D 3775.

1.2 The values stated in SI units are to be regarded as the standard. The values given in parentheses are for information only.

1.3 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 2. Referenced Documents

2.1 *ASTM Standards:* [2]
D 123 Terminology Relating to Textiles
D 1776 Practice for Conditioning and Testing Textiles
D 4850 Terminology Relating to Fabric
2.2 *Other Standard:*
ANSI/ASQC Z1.4—Inspection by Attributes[3]

## 3. Terminology

3.1 *Definitions:*
3.1.1 For definitions of textile terms used in this test method; count, end, end count, filling, pick, pick count, and thread count, refer to Terminology D 4850.

3.1.2 For other textile terms used in this test method, refer to Terminology D 123.

## 4. Summary of Test Method

4.1 The number of warp yarns (ends) per unit distance and filling yarns (picks) per unit distance are determined using suitable magnifying and counting devices or by raveling yarns from fabrics.

## 5. Significance and Use

5.1 This test method is considered satisfactory for acceptance testing of commercial shipments because it has been used extensively in the trade for that purpose.

5.1.1 If there are differences of practical significance between reported test results for two laboratories (or more), comparative test should be performed to determine if there is a statistical bias between them, using competent statistical assistance. As a minimum, use the samples for such a comparative test that are as homogeneous as possible, drawn from the same lot of material as the samples that resulted in disparate results during initial testing and randomly assigned in equal numbers to each laboratory. The test results from the laboratories involved should be compared using a statistical test for unpaired data, a probability level chosen prior to the testing series. If bias is found, either its cause must be found and corrected, or future test results for that material must be adjusted in consideration of the known bias.

## 6. Apparatus

6.1 Use any suitable device, such as pick glass, rule and pointer, microfilm reader, or projection equipment.

6.2 Use a scale graduated in mm ($\frac{1}{16}$ in.) to measure the width of the fabric test specimen to be raveled for a count of yarns.

## 7. Sampling

7.1 *Lot Sample*—As a lot sample for acceptance testing, take at random the number of rolls of fabric as directed in an applicable material specification or other agreement between the purchaser and the supplier. Consider rolls of fabric to be the primary sampling units.

---

[1] This test method is under the jurisdiction of ASTM Committee D13 on Textiles and is the direct responsibility of Subcommittee D 13.60 on Fabric Test Methods, Specific.

Current edition approved Sept. 10, 2003. Published November 2003. Replaces Sections 28 to 34 of Methods D 1910 – 64 (1975). Originally approved in 1979 as D 3775 – 79. Last previous edition approved in 2003 as D 3775 – 03.

[2] For referenced ASTM standards, visit the ASTM website, www.astm.org, or contact ASTM Customer Service at service@astm.org. For Annual Book of ASTM Standards volume information, refer tot he standard's Document Summary page on the ASTM website.

[3] Available from American National Standards Institute, 11 W. 42nd St., 13th Floor, New York, NY 10036.

Copyright © ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States.

D3775 – 03a

7.2 *Laboratory Sample*—As a laboratory sample, take a full width swatch at least 2 m (2 yd) long from each roll of fabric in the lot sample. Consider each designated place at which warp end counts and filling pick counts are made as a test specimen.

NOTE 2—For specimens not obtained as directed in Section 7, the results should not be used for acceptance testing of a lot.

## 8. Conditioning

8.1 Condition specimens as directed in Practice D 1776.

8.2 Fabrics woven from yarns having a relatively low moisture regain in the standard atmosphere for testing textiles, which is $21° \pm 1$ C ($70° \pm 2$ F) and 65 % relative humidity, and which are not significantly affected by minor variations in different atmospheric conditions, for example, nylons, acrylics, and polyesters, may be tested without preconditioning. Fabrics woven from yarns composed wholly or in part from wool, rayon, cotton, or acetate are more sensitive to atmospheric changes and must be conditioned prior to testing, except by agreement of all parties interested in the test results.

8.3 When full rolls or bolts of fabric cannot be properly conditioned in a reasonable time with available facilities, perform the test without conditioning and report the actual conditions prevailing at the time of the test. Such results may not correspond with the results obtained after testing in the standard atmosphere for testing textiles.

## 9. Procedure

9.1 *General:*

9.1.1 For fabric widths 1000-mm (40-in.) or more, make no count closer than 150-mm (6-in.) from the selvage edge or within 0.5 m (0.5 yd) from the end of the roll or piece, except for fabric widths less than 1000-mm (40-in.).

9.1.2 For fabric widths less than 1000-mm (40-in.) and greater than 125-mm (5-in.) make no count closer than one tenth of the width of the fabric, or within 0.5-m (0.5-yd) from the end of the roll or piece.

9.1.3 For fabrics less than 125 mm (5 in.) wide: count all the warp yarns (ends) in the width, including the selvage, and divide by the actual width at that point. For filling yarns (picks), count randomly space along the length as practical.

9.1.4 Count the number of warp yarns (ends) and filling yarns (picks) in five randomly spaced places diagonally across the width of the laboratory sampling unit. Count individual warp yarns (ends) and filling yarns (picks) as single units regardless of whether they are comprised of single or plied components.

9.1.4.1 When two yarns are laid-in together and parallel, then each yarn is counted separately as single units regardless of whether they are comprised of single or plied components.

9.1.5 In fancy weaves where one or more yarns do not appear at regular, short intervals, make count measurements over at least one full pattern repeat of each design component.

9.1.6 When coefficient of variation for five counts is more than 5 % make five additional counts.

9.2 *For Fabrics Containing Less Than 1 Yarn Per mm (25 yarns per in.):*

9.2.1 Count the number of warp yarns (ends) over a 75-mm (3 in.) width in five randomly designated places across the width of the laboratory sampling unit. Successively count the number of filling yarns (picks) over a 75-mm (3 in.) length in five different random places along the length of the laboratory sampling unit.

9.2.1.1 When the coefficient of variation for ten counts on a 75 mm (3 in.) width is more than 5 %, take five counts using a count width of 125 mm (5 in.) subject to 9.1.6.

9.3 *For Fabrics Containing 1 Yarn Per mm (25 yarns per in.) or more.*

9.3.1 Count the number of warp yarns (ends) over 25 mm (1 in.) of fabric width in five randomly designated places across the width of the laboratory sampling unit. Successively count the number of filling yarns (picks) over a 25 mm (1 in.) length in five different random places along the length of the laboratory sampling unit (see 9.1.1 and 9.1.2).

9.4 *Count by Raveling Options*—For fabrics in which individual yarns cannot be readily distinguished for counting in fabric, there are two options as described in 9.4.1.

9.4.1 Take warp counts in five different random places across the width of the laboratory sampling unit. Take successive filling yarn (pick) counts in five different random points along the length of the laboratory sample.

9.4.1.1 One option is to ravel a piece of fabric parallel to the direction to be counted to get a straight edge, then ravel and count the yarns in a 25-mm (1 in.) strip. For example, cut a strip of fabric from each designated place approximately 35 mm (1.5 in.) wide and of practical length parallel to the yarns to be counted. Then, ravel each strip to give a testing width of 35 mm (1 in.) by removing an approximately equal number of yarns from each side prior to counting.

9.4.1.2 A second option is to make a straight cut through the fabric across the yarns to be counted. Place a ruler along the cut edge and mark off a 25-mm (1 in.) length and then count the number of protruding yarns between the two marks. When possible, ravel a yarn or two to emphasize the protruding yarns.

## 10. Calculation

10.1 Calculate the average of all warp end counts made for the warp direction to the nearest individual yarn for each roll and for the lot.

10.2 Calculate the average of all filling pick counts made for the filling direction to the nearest individual yarn for each roll and for the lot.

10.3 When requested, calculate the thread count of the fabric as the sum of the warp end and filling pick counts to the nearest whole number for each roll and for the lot.

## 11. Report

11.1 State that the specimens were tested as directed in Test Method D 3775. Describe the material or product sampled and the method of sampling used.

11.2 Report the following information:

11.2.1 Average number of warp yarns (ends) and filling yarns (picks) per 25 mm (1 in.) calculated to the nearest individual yarn; when stating the count for the fabric, show the warp yarn (end) count first followed by the filling yarn (pick) count for each roll and for the lot. For example:

$$\text{Count} = 100 \times 40 \text{ } or \text{ } 100 \text{ } by \text{ } 40$$

2

NOTE 3—The result is to be read as "one hundred by forty" not as 4000.

11.2.2 Thread count for each roll and for the lot, when requested,

11.2.3 Size of the pattern repeat, size of each design component in the pattern, and the total yarns in each measured component for fabrics having fancy weaves,

11.2.4 Atmospheric conditions under which the tests were conducted and whether the specimens were conditioned as directed in Practice D 1776.

## 12. Precision and Bias

12.1 *Summary*—In comparing two averages of five observations when measuring the warp end or filling pick count of a woven fabric, the difference should not exceed about 0.42 ends or picks/in. in 95 out of 100 cases when all the observations were taken by the same well-trained operator using the same piece of equipment and specimens randomly drawn from the same sample of material. Larger differences are likely under all other circumstances.

12.2 *Interlaboratory Test Data[4]*—An interlaboratory test was run in 1981 in which randomly drawn specimens of four materials were tested in each of four laboratories. Two operators in each laboratory each tested two specimens of each material for both warp end count and filling pick count. The first fabric was a 65 % polyester and 35 % cotton seersucker type basket weave. The second fabric was a 65 % polyester and 35 % cotton gingham check. The third fabric was an 88 % cotton and 12 % polyester corduroy. The fourth fabric was a 100 % cotton denim. Warp end counts ranged from about 50 to 130 ends/in., and filling pick counts ranged from about 50 to 125 picks/in. The components of variance for warp end count and for filling pick count expressed as standard deviations were calculated to be as follows:

| Counts | Single-Operator Component | Within-Laboratory Component | Between-Laboratory Component |
|---|---|---|---|
| *Single Material Comparisons:* | | | |
| Warp End or Filling Pick Counts | 0.337 | 0.000 | 0.458 |
| *Multi-material Comparisons[5]:* | | | |
| Warp End Counts | 0.551 | 0.000 | 0.383 |
| Filling Pick Counts | 0.000 | 0.000 | 0.736 |

---

[4] Supporting data are available from ASTM Headquarters. Request RR: D-13-1067.

NOTE 4—The square roots of the components are being reported to express the variability in the appropriate unit of measure rather than as the square of those units of measure.

12.3 *Precision*—For the components of variance reported in 12.2, two averages of observed values should be considered significantly different at the 95 % probability level if the difference equals or exceeds the critical differences in Table 1.

NOTE 5—The tabulated values of the critical differences should be considered to be a general statement, particularly with respect to between-laboratory precision. Before a meaningful statement can be made about two specific laboratories, the amount of statistical bias, if any, between them must be established with each such comparison being based on recent data obtained on specimens taken from a lot of material of the type being evaluated so as to be as nearly homogeneous as possible and then randomly assigned in equal numbers to each of the laboratories.

12.4 *Bias*—Test Method D 3775 for counting warp ends and filling picks in woven fabrics has no known bias and is used as a referee method.

## 13. Keywords

13.1 construction; fabric; filling pick count; warp end count; woven

---

[5] The single-operator components for multi-material comparisons are in addition to the single-operator components for single-material comparisons and are not reduced by replication.

**TABLE 1 Critical Differences for the Conditions Noted, 95 % Probability Level, Ends or Picks/in.[A]**

| Number of Observations in Each Average | Single-Operator Precision | Within-Laboratory Precision | Between-Laboratory Precision |
|---|---|---|---|
| Single-material Comparison (warp end or filling pick count) | | | |
| 1 | 0.93 | 0.93 | 1.58 |
| 5 | 0.42 | 0.42 | 1.34 |
| 10 | 0.30 | 0.30 | 1.30 |
| 20 | 0.21 | 0.21 | 1.29 |
| Multi-material Comparison (warp end count only) | | | |
| 1 | 1.79 | 1.79 | 2.08 |
| 5 | 1.58 | 1.58 | 1.91 |
| 10 | 1.56 | 1.56 | 1.88 |
| 20 | 1.54 | 1.54 | 1.87 |
| Multi-material Comparison (filling pick count only) | | | |
| 1 | 0.93 | 0.93 | 2.24 |
| 5 | 0.42 | 0.42 | 2.08 |
| 10 | 0.30 | 0.30 | 2.06 |
| 20 | 0.21 | 0.21 | 2.05 |

[A] The critical differences were calculated using t = 1.960 which is based on infinite degrees of freedom.

ASTM International takes no position respecting the validity of any patent rights asserted in connection with any item mentioned in this standard. Users of this standard are expressly advised that determination of the validity of any such patent rights, and the risk of infringement of such rights, are entirely their own responsibility.

This standard is subject to revision at any time by the responsible technical committee and must be reviewed every five years and if not revised, either reapproved or withdrawn. Your comments are invited either for revision of this standard or for additional standards and should be addressed to ASTM International Headquarters. Your comments will receive careful consideration at a meeting of the responsible technical committee, which you may attend. If you feel that your comments have not received a fair hearing you should make your views known to the ASTM Committee on Standards, at the address shown below.

This standard is copyrighted by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959, United States. Individual reprints (single or multiple copies) of this standard may be obtained by contacting ASTM at the above address or at 610-832-9585 (phone), 610-832-9555 (fax), or service@astm.org (e-mail); or through the ASTM website (www.astm.org).

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**     **SEP 04, 2024**

**TIME:**     **10:30 am**

**PLACE:**     **Department 610**
                 **400 McAllister Street**
                 **San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

---

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order   **without an appearance**   at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

---

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.   **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

---

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

---

Plaintiff  **must**  serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td></td><td><em>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</em></td></tr>
</table>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Target Corporation, and DOES 1-100, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Alexander Panelli, individually, and all others similarly situated

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

   *¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Civic Center Courthouse<br><br>400 McAllister St. San Francisco, CA 94102 | **CASE NUMBER:**<br>*(Número del Caso):*<br><br>**CGC-24-613684** |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Mark A. Redmond 656 5th Ave. Ste R San Diego, CA 92101 (619) 225-7655

| DATE:<br>*(Fecha)* **04/05/2024** | Clerk, by<br>*(Secretario)* **DAEJA ROGERS** | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL] Superior Court of California — County of San Francisco — EUREKA

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)        ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|

**Mark Redmond SBN 161520**
**Salisbury Legal Corp.**
**656 Fifth Avenue Suite R**
**San Diego, CA 92101**
TELEPHONE NO.:   **(619) 241-2760**                    FAX NO. *(Optional):*

E-MAIL ADDRESS *(Optional):* **mark@schultzredmond.com**
ATTORNEY FOR *(Name):*     **Plaintiff**

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**04/15/2024**
**Clerk of the Court**
**BY: YOLANDA TABO**
**Deputy Clerk**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO - CENTRAL (EFILING)**
STREET ADDRESS:  400 McAllister St
MAILING ADDRESS:  400 McAllister St
CITY AND ZIP CODE:  San Francisco, CA 94102
BRANCH NAME:  SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO -
CENTRAL (EFILING)

| | |
|---|---|
| PLAINTIFF/PETITIONER:   Alexander Panelli, individually, and all others similarly situated | CASE NUMBER: CGC-24-613684 |
| DEFENDANT/RESPONDENT:   Target Corporation, and DOES 1-100, inclusive | |

| | |
|---|---|
| **PROOF OF SERVICE SUMMONS** | Ref. No. or File No.: Target |

(Separate proof of service is required for each party served.)

1.   At the time of service I was at least 18 years of age and not a party to this action.                    BY FAX

2.   I served copies of:  ***Alternative Dispute Resolution Information Package, Stipulation to Alternative Dispute Resolution ; Summons , Complaint***

3.   a.  Party served *(specify name of party as shown on documents served):* **Target Corporation**

     b.  ☒   Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):* **Jessie Gastelum , Agent  for C.T. Corporation System**

4.   Address where the party was served: ***330 N Brand Blvd Glendale, CA 91203***

5.   I served the party *(check proper box)*
     a.  ☒   **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on: *4/9/2024* (2) at: **11:57 AM**
     b.  ☐   **by substituted service.** On*:*  at:  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

          (1)  ☐   **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

          (2)  ☐   **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

          (3)  ☐   **(physical address unknown)** a person at least 18 years of  age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

          (4)  ☐   I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents:
              *on:*         *from:*              **or**  ☐  a declaration of mailing is attached.

**Page 1 of 3**

**Invoice # 9416012**

| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER:<br>CGC-24-613684 |
| --- | --- |

(5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on:                              (2) from:

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. (*Attach completed* Notice and Acknowledgment of Receipt.) (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☒ On behalf of *(specify):* **Target Corporation**
    under the following Code of Civil Procedure section:

    ☒ 416.10 (corporation)              ☐ 415.95 (business organization, form unknown)

    ☐ 416.20 (defunct corporation)       ☐ 416.60 (minor)

    ☐ 416.30 (joint stock company/association)   ☐ 416.70 (ward or conservatee)

    ☐ 416.40 (association or partnership)     ☐ 416.90 (authorized person)

    ☐ 416.50 (public entity)             ☐ 415.46 (occupant)

                                       ☐ other:

7. **Person who served papers**

    a. Name: **James P Sands**

    b. Address: **11024 Balboa Blvd # 1462 , Granada Hills, CA 91344**

    c. Telephone number: **909-664-9577**

    d. **The fee** for service was: **$125.00**

    e. I am:

        (1) ☐ not a registered California process server.

        (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

        (3) ☒ a registered California process server:

            (i) ☐ owner    ☐ employee    ☒ independent contractor.

            (ii) Registration No.: **914**

            (iii) County: **Los Angeles**

| PLAINTIFF/PETITIONER:<br>DEFENDANT/RESPONDENT: | CASE NUMBER:<br>CGC-24-613684 |
|---|---|

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.



James P Sands                    Date: **04/10/2024**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address) | TELEPHONE NUMBER | FOR COURT USE ONLY |
|---|---|---|
| **Mark Redmond SBN 161520**<br>**Salisbury Legal Corp.**<br>**656 Fifth Avenue Suite R**<br>**San Diego, CA 92101**<br>ATTORNEY FOR    **PLAINTIFF** | **(619) 241-2760** | **ELECTRONICALLY**<br>**F I L E D**<br>*Superior Court of California,*<br>*County of San Francisco*<br>**04/15/2024**<br>**Clerk of the Court**<br>**BY: YOLANDA TABO**<br>**Deputy Clerk** |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO - CENTRAL (EFILING)<br>400 McAllister St<br>San Francisco, CA 94102 | |
|---|---|

| SHORT TITLE OF CASE:<br>Alexander Panelli v. Target Corporation | |
|---|---|

| DATE:         TIME:         DEP./DIV. | CASE NUMBER:<br>CGC-24-613684 |
|---|---|
| **Proof of Service** | Ref. No. or File No:<br>Target |

**BY FAX**

1. At the time of service I was at least 18 years of age and not a party to this action, and I served copies of the:

    **Notice of Case Management Conference**

2. Party Served: **Target Corporation**

3. Address: **330 N Brand Blvd Glendale, CA 91203**

    On: **4/12/2024**                    At: **12:41 PM**

4. I served the Party named in item 2, by personally serving agent:
    **Jaqueline Mejia  (Gender: F Age: 30 Height: 5'5 Weight: 145 Race: Hispanic  Hair: Black Other: )**
    **Agent for C.T. Corporation Systems**

5. A declaration of diligence and/or mailing is attached, if applicable.


Person attempting service:

    a. Name: **James P Sands**
    b. Address: **15345 Fairfield Ranch Rd  Suite 200, Chino Hills, CA 91709**
    c. Telephone number: **909-664-9577**
    d. **The fee** for this service was: **125.00**



I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.




| | |
|---|---|
| **James P Sands** | Date: **04/12/2024** |